1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO:  3:19-CR-215-MMH-PDB

UNITED STATES OF AMERICA                 Jacksonville, Florida

        -vs-                             Date: November 23, 2021

JEREMIAH BEZROUKOFF                       Time:  9:38 a.m. - 11:12 a.m.
DAVID FUNES,
        Defendants.                      Courtroom:  10B
_____

**SENTENCING**
BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

Cindy Packevicz Jarriel, RPR, FCRR
115 Davis Street
Neptune Beach, FL  32266
Telephone:  904.651.8997
e-mail:  cindyrprfcrr@gmail.com
        (Proceedings reported by stenography; transcript
produced by computer.)

1                    A P P E A R A N C E S

2


3    COUNSEL FOR GOVERNMENT:

4    **JULIE HACKENBERRY, ESQ.**
     U.S. Attorney's Office - FLM
5    300 N. Hogan Street, Suite 700
     Jacksonville, FL  32202
6

7    COUNSEL FOR DEFENDANT BEZROUKOFF:

8    **DONALD B. MAIRS, ESQ.**
     The Mairs Law Firm
9    1514 Landon Avenue
     Jacksonville, FL 32207
10

11   COUNSEL FOR DEFENDANT FUNES:

12   **DAVID AUSTIN MAKOFKA, ESQ.**
     Makofka & Makofka
13   Suite 3304
     1 Independent Dr
14   Jacksonville, FL 32202

15                          -   -   -

16


17                    E X H I B I T S

18   For Identification                          Page

19   Bezroukoff Exhibit 1......................53

20   Funes Exhibit 1...........................54

21   Funes Exhibit 2...........................54

22                          -   -   -

23


24


25

P R O C E E D I N G S

November 23, 2021                                    9:39 a.m.

- - -

COURT SECURITY OFFICER:  All rise.

The United States District Court, in and for the Middle District of Florida, is now in session.  The Honorable Marcia Morales Howard presiding.

Please be seated.

THE COURT:  This is Case No. 3:19-cr-215-MMH-PDB.  It is the United States of America versus Jeremiah Bezroukoff and David Funes.

Ms. Hackenberry is here on behalf of the United States.

Mr. Mairs is here on behalf of Mr. Bezroukoff.

Mr. Makofka is here on behalf of Mr. Funes.

Ms. Hackenberry, is the United States prepared to proceed?

MS. HACKENBERRY:  Yes, Your Honor.

THE COURT:  And you, Mr. Mairs?

MR. MAIRS:  Yes, Your Honor.

THE COURT:  And Mr. Makofka?

MR. MAKOFKA:  Yes, Your Honor.

THE COURT:  Mr. Bezroukoff and Mr. Funes, on December 13th of 2019, each of you entered a guilty plea to Count One of the indictment which charged you with conspiracy to commit

1  health care fraud, in violation of Title 18, United States Code

2  § 1349 -- § 1349.

3        Mr. Bezroukoff, Count Two -- you also entered a plea

4  of guilty to Count Two which charged you with receipt of a

5  kickback in connection with the Federal Health Care Benefit

6  Program, in violation of Title 42, United States Code §

7  1320a-7b(b)(1)(A), and to Count Four, which charged you with

8  illegal monetary transaction, in violation of Title 18, United

9  States Code §§ 1957 and 2.

10        And, Mr. Funes, you also pled guilty to Count Three,

11  which charged you with receipt of a kickback in connection with

12  the Federal Health Care Benefit Program, in violation of Title

13  42, United States Code § 1320a-7b(b)(1)(A), and Count Five,

14  which charged you with an illegal monetary transaction, in

15  violation of Title 18, United States Code §§ 1957 and 2.

16        The Court has accepted both of those guilty pleas and

17  has adjudicated you, Mr. Bezroukoff, on Counts One, Two, and

18  Four, and you, Mr. Funes, on Counts One, Three, and Five.

19        We are at the stage of the proceedings where it's

20  necessary for the Court to determine the appropriate sentence.

21        There is a process that the Court follows for

22  sentencing and it begins with the preparation of a presentence

23  report.  And the next thing that's supposed to happen is that

24  each of you is supposed to review that presentence report with

25  your attorney.

```
 1              Mr. Funes, did you -- am I pronouncing your name
 2    correctly?
 3              DEFENDANT FUNES:  It's Funes.
 4              THE COURT:  Funes?
 5              DEFENDANT FUNES:  That's close enough.
 6              Yes, Your Honor.
 7              THE COURT:  Did you have an opportunity to review the
 8    PSR with your attorney?
 9              DEFENDANT FUNES:  Yes, Your Honor.
10              THE COURT:  And did Mr. Makofka answer any questions
11    that you may have had?
12              DEFENDANT FUNES:  Yes, Your Honor.
13              THE COURT:  Mr. Makofka, did you have sufficient
14    opportunity to review the PSR with this gentleman?
15              MR. MAKOFKA:  Yes, Your Honor.
16              THE COURT:  Does he have any outstanding objections
17    to the factual statements or the guideline calculations?
18              MR. MAKOFKA:  No, Your Honor.
19              THE COURT:  All right.  Mr. Bezroukoff, did you have
20    an opportunity to review the presentence report?
21              DEFENDANT BEZROUKOFF:  Yes, Your Honor.
22              THE COURT:  And did Mr. Mairs answer any questions
23    that you may have had?
24              DEFENDANT BEZROUKOFF:  Yes, Your Honor.
25              THE COURT:  Mr. Mairs, did you have sufficient
```

```
 1    opportunity to review the presentence report with him?
 2              MR. MAIRS:  I did, Your Honor.
 3              THE COURT:  Does he have any outstanding objections
 4    to the factual statements or the guideline calculations?
 5              MR. MAIRS:  He does not.
 6              THE COURT:  All right.  Mr. Mairs, if you -- do you
 7    happen to have a copy of the -- I think I said "indictment"
 8    earlier; I meant to say "information."
 9              Do you happen to have a copy of the information in
10    front of you?
11              MR. MAIRS:  I will.
12              THE COURT:  I'll hand mine down.
13              Mr. Bezroukoff's name is spelled two different ways.
14              I want to make sure we have it correctly.
15              Madam Deputy, can you hand that to Mr. --
16              MR. MAIRS:  Without a U.
17              THE COURT:  Can you tell me what the correct spelling
18    is?
19              MR. MAIRS:  It's with a "U" is the correct spelling,
20    r-o-u.
21              THE COURT:  Can I have an agreement of the parties
22    that we correct the style of the case so that the -- the
23    judgment is -- has the correct spelling of Mr. Bezroukoff's
24    name?
25              MS. HACKENBERRY:  That's fine, Your Honor.
```

1      MR. MAIRS:  Yes, that's fine.

2      THE COURT:  Okay.  Madam Deputy, I will direct the

3  Clerk of Court to correct the spelling of Mr. Bezroukoff's name

4  on the style of the case on the Court's docket, please.

5      All right.  Ms. Hackenberry, does the United States

6  have any objections to the guidelines -- to the factual

7  statements or the guidelines for either Mr. Funes or

8  Mr. Bezroukoff?

9      MS. HACKENBERRY:  No objection, Your Honor.

10      THE COURT:  All right.  With regard to

11  Mr. Bezroukoff, the United States has filed Document No. 49,

12  which is a motion by the United States for downward departure

13  of defendant's sentence based on substantial assistance in

14  which the Government recommends a four-level downward departure

15  for Mr. Bezroukoff based upon his cooperation.

16      And in -- with regard to Mr. Funes, United States has

17  filed Document No. 50, which similarly recommends a four-level

18  reduction in the offense level for cooperation.

19      Ms. Hackenberry, do you wish to be heard as to those

20  motions?

21      MS. HACKENBERRY:  Yes, Your Honor.

22      THE COURT:  And you can remove your mask while you're

23  speaking.

24      MS. HACKENBERRY:  Thank you, Your Honor.

25      As Your Honor knows from having presided over the

1   trial of some of the co-defendants in this case, Mr. Bezroukoff
2   and Mr. Funes were both individuals that came in very early on
3   during the investigation and made the decision to cooperate
4   with law enforcement at that time and to plead guilty to the
5   information, as the Court has noted.
6           In -- as we were working on the investigation, and as
7   Your Honor knows from the way the trial testimony played out,
8   Dr. Agatep was one of the first individuals that was writing
9   prescriptions for these patients that were being recruited in
10  order for the prescriptions to be filled at various pharmacies,
11  which TRICARE was paying out a significant amount of money for
12  the prescriptions.
13          So having approached Mr. Bezroukoff and Mr. Funes, it
14  was a pretty significant step forward in the investigation and
15  ultimately led to -- their cooperation also led to Dr. Agatep
16  and his decision to plead guilty and to cooperate as well.
17          And so these three individuals, Bezroukoff, Funes,
18  and Dr. Agatep, really were some of the first people that law
19  enforcement officers approached to seek their cooperation, and
20  they agreed to do that.
21          And I have to say that I spent time with each of
22  them, with Mr. Bezroukoff and Mr. Funes.  As we were going
23  through the grand jury process and investigating the case and
24  putting different witnesses before the grand jury, their
25  information was very helpful to us in figuring out what other

1    individuals were doing as far as their involvement and their

2    participation in this scheme, as well as Mr. Bezroukoff and

3    Mr. Funes themselves.

4            As a result of their cooperation, Dr. Agatep

5    cooperated as well, pled guilty, and I feel like that kind of

6    package deal was pretty significant to the entire case overall.

7            And had it not been for Mr. Bezroukoff and Mr. Funes

8    agreeing to cooperate, I don't know that that would have played

9    out the way that it did.

10           But, nonetheless, it did work out that way, and

11   they -- I filed a 5K motion asking the Court to consider the

12   same reduction for Mr. Funes and Mr. Bezroukoff.  Although the

13   Court, I'm sure, knows that Mr. Bezroukoff was the only -- the

14   one that testified at trial, and I thought that he presented

15   very well.  He was forthright and did a good job at trial, and

16   I do appreciate his willingness to testify and to stick with

17   the plea agreement and his decision to cooperate with law

18   enforcement.

19           I had -- Mr. Funes also was potentially a witness at

20   the trial, but I made the -- just kind of strategic decision to

21   use Mr. Bezroukoff to testify and not to call Mr. Funes.  But

22   he was willing and ready and able to testify, if -- if the

23   Government would have gone that route, but we didn't.

24           But, nonetheless, I ask the Court to consider a

25   four-level reduction for both of them, given their early --

1   coming in early and pleading guilty, and their continued

2   willingness to cooperate and testify, if necessary.

3          And so I think that a four-level reduction for each

4   of them is appropriate.  I think Mr. Bezroukoff's base offense

5   level was one level higher than Mr. Funes, but I would ask the

6   Court to consider, if we need to, to, say, a five level for

7   Mr. Bezroukoff in order to make them come out at the same

8   guideline range, which I think would be appropriate.

9          THE COURT:  All right.  Before I hear -- ask if --

10  you're reminding me, Ms. Hackenberry, that I didn't actually

11  say out loud what the guideline calculations were for these

12  gentlemen.  So let me -- let me do that.

13         For Mr. Bezroukoff, it's total offense level of 25,

14  Criminal History Category is I, which yields a guideline term

15  of imprisonment of 57 to 71 months; 1 to 3 years supervised

16  release; restitution in the amount of $8,461,758.62; fines

17  ranging from 10,000 to $100, and a $300 special assessment.

18         With regard to Mr. Funes, it's a total offense level

19  of 24; Criminal History Category of I, which yields a guideline

20  term of imprisonment of 51 to 63 months; 1 to 3 years

21  supervised release; restitution in the amount of $3,560,758.79;

22  fines ranging from $10,000 to $100,000, and $300 in special

23  assessments.

24         Mr. Mairs, is that consistent with your

25  understanding for Mr. Bezroukoff?

1        MR. MAIRS:  Yes, Your Honor.

2        THE COURT:  And, Mr. Makofka, is that consistent with

3   your understanding for Mr. Funes?

4        MR. MAKOFKA:  It is, Your Honor.

5        THE COURT:  And, Ms. Hackenberry, as to both of these

6   gentlemen, did the guidelines expressed by the Court comport

7   with your understanding?

8        MS. HACKENBERRY:  Yes, Your Honor.

9        THE COURT:  Okay.  Then --

10        MS. HACKENBERRY:  So when looking at -- if I could

11   just follow up briefly, Your Honor.

12        Then looking at the guidelines as the Court has

13   calculated them, if there were a four-level reduction as the

14   Government requested by way of a 5K, then I would ask the Court

15   to consider a five-level as to Mr. Bezroukoff in order to make

16   their guidelines both at offense level 20, Criminal History

17   Category I, of a range of 33 to 41 months.

18        THE COURT:  Thank you, Ms. Hackenberry.

19        Mr. Makofka, do you wish to be heard as to the

20   Government's motion for Mr. Funes?

21        MR. MAKOFKA:  Yes, Your Honor, briefly.

22        THE COURT:  Go ahead.

23        MR. MAKOFKA:  Thank you.  May I remove my mask?

24        THE COURT:  You may.

25        MR. MAKOFKA:  Your Honor, having heard what the

1    Government has said concerning Mr. Funes, I tend to agree that

2    his cooperation was absolutely essential in this case.

3           I've been representing this gentlemen since, I

4    believe, sometime mid 2016, so for the last five or so years

5    I've been his counsel.  And when I was appointed to represent

6    him preindictment, we had numerous meetings with the Government

7    and case agents.  And I sat there and listened to this.  It was

8    very apparent to me that his role as a cooperating individual

9    was -- was critical.

10          The information that was provided, I think, opened up

11   a number of areas of prosecution for the Government, and he's

12   continued to remain steadfast in his determination to help.

13   Although he didn't testify in the trial, he was, as the

14   Government's indicated, more than willing to come from Austin,

15   Texas, where he resides, to this locale to make that happen.

16          And so, in my view, given everything that he's done,

17   and I believe this was -- was above and beyond the ordinary, I

18   think I would be remiss if I didn't ask the Court to consider

19   awarding him 5K consideration to the extent of eight levels,

20   and that would be my request.

21          I understand that the Government thinks that four is

22   sufficient.  I feel that given the length of time that he's

23   been cooperating and the amount of information he's given

24   that's led to a number of successful convictions in this case,

25   I think it's just -- four is not sufficient.  So I would

1   request an eight-level reduction on behalf of Mr. Funes.

2           Thank you.

3           THE COURT:  Thank you.

4           Mr. Mairs?

5           MR. MAIRS:  As it relates to Mr. Bezroukoff, as the

6   Court, I'm sure, recalls, he actually testified.  I was present

7   for that testimony, was able to observe his demeanor.

8           I thought, particularly as it related to questions on

9   cross-examination, he was helpful to the Government.  I believe

10  the jury would have listened to what he had to say.  He did not

11  shy away from his responsibility in the case.

12          I was not involved in the original representation.

13  As the Court may remember, Mr. Berry passed away and I agreed

14  to take it over.  By that point, Mr. Bezroukoff had already, as

15  you heard today, you know, essentially cooperated and had been

16  assisting authorities.

17          We met and I explored with him sort of the path

18  forward.  I don't think any of us thought that it would take

19  this long to get to trial.  Nobody envisioned COVID, I'm sure.

20  I believe Mr. Bezroukoff expressed that that six-and-a-half

21  years of purgatory, as, I guess, I'll call it that, has had an

22  impact on him.  And I think, you know, that would apply to the

23  other defendant here today, that, you know, the unusual length

24  of time from when, you know, the shoe drops and you're

25  presented with options, he obviously on his own made the

1    decision to be willing to help the Government, really, without

2    a lawyer early on.  He had, I think, counseling before,

3    Mr. Berry, and they, I'm sure, consulted and he cooperated.

4            I think his consistency -- and that includes -- I

5    think it was over two days of testimony.  Maybe not two full

6    days, but in any case, I think his information against

7    Mr. Balotin in particular was critical to the Government being

8    able to ultimately secure a conviction.

9            You know, I -- the Government has the ability to

10   decide who to call as a witness.  And I don't want to, you

11   know, somehow point to Mr. Funes as not having testified and so

12   he shouldn't get, you know, the same amount.  But the fact of

13   the matter is, coming into court and, you know, sitting in a

14   courtroom and testifying and being subjected to

15   cross-examination has -- has its own challenges.  And, you

16   know, I'll leave it to the Court to recall how -- how

17   Mr. Bezroukoff did.

18           So I think that the Court could certainly give a

19   larger departure than -- I guess I heard today now five levels

20   in thinking about his participation from start to where we are

21   today.  Thank you.

22           THE COURT:  Thank you, Mr. Mairs.

23           Ms. Hackenberry, anything further?

24           MS. HACKENBERRY:  Nothing further, Your Honor.

25           THE COURT:  The Court will grant the motions for

1   downward departure -- Document No. 49 as to Mr. Bezroukoff;

2   Document No. 50 as to Mr. Funes.  And as to Mr. Bezroukoff will

3   depart downward by six levels, and as to Mr. Funes, depart

4   downward by five levels.

5              For each of these gentlemen, that results in a total

6   offense level post departure of 19, Criminal History Category

7   of I, which yields a guideline term of imprisonment of 30 to 37

8   months.

9              And with that, Ms. Hackenberry, I will hear from the

10  Government as to the Government's recommendation.

11             Then, Mr. Mairs, I'll hear from you on behalf of

12  Mr. Bezroukoff, and I'll give Mr. Bezroukoff an opportunity to

13  speak, if you'd like to do so.  You don't have to, but it is

14  your right.

15             And similarly, Mr. Makofka, I'll hear from you as to

16  Mr. Funes.

17             And, Mr. Funes, I'll give you an opportunity to

18  speak.

19             And if either of you have witnesses to call, you're

20  certainly free to call them at your leisure.

21             And, Ms. Hackenberry, are you anticipating any

22  representation by the victim?

23             MS. HACKENBERRY:  No, Your Honor.

24             THE COURT:  Okay.  Then let me hear your

25  recommendations, please.

1    MS. HACKENBERRY:  Your Honor, now that the Court has
2    made its findings with regard to the 5K, bringing that total
3    offense level down to 19, Criminal History Category I, of a
4    range of 30 to 37 months, I would ask the Court to sentence
5    both of the defendants to the low end of the guideline range.
6    I think that's an appropriate sentence for all the
7    reasons that I've stated previously, and also as Your Honor --
8    as I mentioned before, you sat through the trial, you heard
9    Mr. Bezroukoff testify, you understood the involvement that he
10   and Mr. Funes both had in this particular conspiracy.  And
11   again, their cooperation was key, and it was very helpful, and
12   I think that it had a big impact ultimately on the jury's
13   decision, so I would ask the Court to consider sentencing them
14   each to the low end of the guideline range.
15   THE COURT:  Thank you, Ms. Hackenberry.
16   So Mr. Mairs?
17   MR. MAIRS:  Your Honor, I did provide to the Court a
18   report that was authored by Dr. Kohn.  I also provided
19   Dr. Kohn's CV, which described his training and background.  He
20   did evaluate Mr. Bezroukoff, and as the report reflects --
21   THE COURT:  Yeah.  And let me just say for the record
22   that Mr. Mairs did file defendant's motion for downward
23   departure, which is Document No. 57.
24   I confess, Mr. Mairs, that as I -- it seemed more of
25   a variance motion, but I guess I do need to hear from you to

1   the extent that you want me to consider it as a guideline

2   departure, and also hear from Ms. Hackenberry as to her

3   position on whether it's appropriate for a guideline departure

4   rather than a variance.

5          MR. MAIRS:  Well, I just tracked the policy statement

6   in 5H1.3 of the sentencing guidelines in evaluating how to

7   phrase it.  It seems to suggest that in some cases a departure

8   is warranted if certain conditions individually or in

9   combination, and so that I -- either that or a variance, it's,

10  I think, relevant in this case.  Because, as you recall,

11  Mr. Bezroukoff was still in the military when he met

12  Mr. Balotin.  And he testified to that.  It's, of course,

13  reflected in the PSR.  But -- and was, you know, coming off of

14  a type of service -- and Dr. Kohn discusses it -- that it's,

15  you know -- and I'm not in any way demeaning regular Army

16  service, but he was in a Special Forces role that took years to

17  train for and put him in situations where, you know, high risk

18  is the everyday.

19         And I think that Dr. Kohn, you know, talks about

20  that.  That's the individual that, you know, through sort of

21  happenstance meets Scott Balotin, and, you know, is offered

22  this opportunity.

23         And in trying to sort of explain why he would engage

24  in that behavior -- and I know you probably remember -- he said

25  the money -- you know, I don't know if he used the phrase,

1   "drunk with money."

2           THE COURT:  I think he did, yeah.

3           MR. MAIRS:  Yeah.  I remember sitting there and

4   hearing that, and, you know, I thought it was, you know, a

5   pretty good illustration or description of what happened.  But

6   I think you have to include his experience, as with all

7   defendants, leading up to that moment.

8           And I think Dr. Kohn, you know, sort of illustrates

9   or describes how that individual, Mr. Bezroukoff, you know,

10  could have found himself willing to engage in the behavior that

11  led him to today, and, in part, impacted by the type of

12  missions that he was on, and I think he'll speak to that.

13          I will tell the Court that we had discussions with

14  the Government, you know, exploring the possibility of veterans

15  court.  And I know in the state system, we use it for

16  individuals who have been in the service.  And the idea -- it

17  usually has a mental health component.  It's just not something

18  that was feasible in this particular situation.  But it is, I

19  think, something that suggests why those courts, alternative

20  courts, now exist.

21          It is kind of -- Mr. Bezroukoff is sort of -- I don't

22  want to say a poster child, but someone who is impacted by

23  PTSD, and ends up making poor decisions, you know, that led to

24  him being here.  And, of course, the restitution amount you

25  described, you know, is large.  And I've explained to

1    Mr. Bezroukoff, it's just of a size and nature that, you know,

2    the guidelines drive where he is.

3           But I do think, and I thought it was important once

4    Dr. Kohn's office contacted me -- Mr. Bezroukoff, on his own,

5    you know, sought this evaluation, wanted to learn more about

6    you know, why he might have engaged in this behavior.  And I

7    thought it was important for the Court to have it before it,

8    because I do think, either as a variance or a departure, it

9    would give the Court justification for going below what we've

10   just sort of landed on right now as the guidelines.

11          You know, I -- I won't continue to talk about

12   Mr. Bezroukoff's -- you probably won't be surprised by this,

13   you know, his willingness to deal with this case.  He

14   communicated with me, with the Government, you know, it is --

15   or has continued to be consistent, and, you know, I'll tell you

16   this, we didn't know -- I don't know whose fault this is,

17   probably mine -- that you were starting your trial related to

18   Mr. Balotin at all until a fairly short time before it started

19   and got contacted by the Government.

20          THE COURT:  It was set for six months.

21          MR. MAIRS:  I know.  And, like I said, I'll take

22   responsibility for that.  But, you know, I think Mr. Bezroukoff

23   may have said, you know, it had been set for trial.  I thought

24   it was going to go.  I think he said he was surprised.

25          But I will say this, when I reached out to him, he

1    immediately got back with me.  I told him, you know, he needed

2    to be here, and he got here.  And, you know, I think Government

3    would echo that, that he knew what he needed to do, I think, in

4    some ways, this day today is one that -- I think he said during

5    the trial he hoped he never would have to be in a position to

6    testify, which I thought was also an interesting, you know,

7    sort of explanation, because the lawyers for the defendants

8    were saying:  You're hoping for, you know, this -- this

9    benefit.

10             And he said:  I hoped I never really would have to be

11   here.

12             And I think that, again, gives you a little insight

13   into Mr. Bezroukoff.  I think whatever sentence the Court

14   fashions, I don't have any doubt that he'll follow through and

15   do what you tell him to do, but I do think he would like the

16   opportunity to speak to the Court.

17             THE COURT:  Before I hear from Mr. Bezroukoff,

18   Ms. Hackenberry, to the extent this is a motion for a downward

19   departure under the guidelines, what is the United States'

20   position?

21             MS. HACKENBERRY:  Your Honor, I think it's -- I don't

22   really think it's an appropriate departure, but it's something

23   that the Court can take into consideration under the 3553

24   factors.

25             And I -- I did review all of those materials that I

1    received as well in advance of the sentencing, and in making my
2    recommendation as to -- regarding that sentence, I did take all
3    of that into account as well.  So I don't believe that any
4    additional variance is appropriate.
5             THE COURT:  All right.  So to the extent it's a
6    guideline departure, I think that certainly Dr. Kohn's report
7    is helpful to the Court in that there was some description of
8    Mr. Bezroukoff's decision-making that -- that really seemed
9    entirely consistent with what the Court heard from him, and
10   even his -- his demeanor when testifying, and so it is helpful
11   and certainly it provides information regarding his mental
12   health challenges.  But to the extent that it's a guideline
13   departure, I think that the difficulty is that the mental
14   health conditions that Mr. Bezroukoff is suffering from, in my
15   view, are not present to an unusual degree that would
16   distinguish the case from typical cases.
17            It's -- so I don't think it's appropriate for a
18   guideline departure, but I think the information is entirely
19   appropriate for the Court to consider in terms of a variance,
20   whether it will -- whether it results in a variance or not
21   will -- will be decided.  But to the extent that it's a -- it
22   is presented as a guideline departure, I would not find it to
23   be appropriate and would overrule or deny that request, but I
24   will consider it to the extent it's appropriate for a variance.
25            So, Mr. Bezroukoff, is there anything you'd like to

1  say, sir?  You don't have to speak, but, as I said, it's your

2  right.

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Why don't you come up to the podium and

5  you can remove your mask when you're speaking.  You don't have

6  to, but you can.

7          DEFENDANT BEZROUKOFF:  Your Honor, there's one

8  document here I wanted to reference in my talk.

9          THE COURT:  Okay.

10          MR. MAIRS:  The Government has seen a representation

11  of this study.  I provided -- Mr. Bezroukoff prepared and sent

12  it to the Government.  It included that, so they're aware of

13  it.

14          THE COURT:  Okay.  Go ahead, Mr. Bezroukoff.

15          DEFENDANT BEZROUKOFF:  I want to start off by saying

16  that no matter what I say up here today, I don't want it to

17  overshadow the fact that I really messed up, that I committed

18  crimes, that I defrauded TRICARE.  I put others in jeopardy,

19  and I was just acting like a completely trashy human being back

20  then.  And I'll always, always be disappointed in myself and

21  I'll always regret what I did.

22          So I don't want the reasons why I believe that I got

23  involved to overshadow any of that.

24          When I was here testifying, Scott Balotin's attorney

25  showed me a document.  It was an email that I had sent to Scott

1    right after I first met him.  And the date of that email was
2    somewhere around the middle of July.  And I had just gotten
3    back from Afghanistan July 1st.  So about two weeks after
4    getting back from Afghanistan, a very dangerous deployment,
5    where I was member of the Special Forces team, a Green Beret,
6    where I would be shot at daily, every week I was in battles,
7    the type of stuff that you only see in movies.
8            And so when I got back from that deployment, I was a
9    different person than who I was before that deployment, than
10   who I had ever been before in my life.
11           When I got back, I was aggressive all the time.  I
12   was very confrontational.  I'd want to fight people.  I would
13   verbally argue with them.  I would want to get into dangerous
14   situations.
15           The PTSD affected me in a way that I had never been
16   before.  I developed substance abuse issues.  I was getting
17   black-out drunk three to four times a week.  I was doing
18   illicit drugs.  And that -- at the height of that is when I met
19   Scott Balotin.  I was introduced to CasePark, Carter's
20   Pharmacy, the whole fraudulent scheme.
21           The best way I could sum up how I was at that time,
22   and thank God I was never in this situation, is if somebody had
23   ever asked me to play Russian roulette, you know, the game you
24   put one bullet in, pull the trigger, one in six chance you kill
25   yourself, I would have jumped at that opportunity.  I had no

1   regard for my own safety or my future.

2           And so I want to describe why I believe in my heart

3   that PTSD was the main contributing factor as to why I got

4   involved and why it was out of character for me.

5           The study that I -- that I passed on up there, this

6   was a 2010 study, done on combat marines.  And on page 6, I

7   have highlighted a section, it's the results of the study, and

8   you'll see there that -- the highlighted section that:  Marines

9   who are in the war-deployed cohort who had PTSD also were 11.1

10  times more likely to have a misconduct discharge.

11          11 times more likely is very significant.  And a

12  misconduct discharge from the military, that's not that you

13  show up to work late or that your boss doesn't like you, that

14  means you did something very criminal.

15          All my years in the Army, I only ever knew two people

16  to get a misconduct discharge, one was for getting three DUIs,

17  and the other one was for two situations of domestic abuse.

18          So this study -- and there's many others like this,

19  but this just kind of gives you an idea of the numbers behind

20  this, that for some reason, going to combat and coming back

21  with the demons of PTSD, many times it can lead to

22  decision-making that that person never otherwise would have

23  made.

24          And the Government has actually acknowledged this.

25  The Department of Justice has acknowledged this.  That's why

1  there's over 500 veterans' treatment courts in the United

2  States.

3          The structure of Veterans' Court is that if

4  somebody -- if a veteran commits a crime and they also have

5  PTSD or a mental illness from the military, they can be

6  diverted into veterans' court where they go through a one- to

7  two-year probationary period, a treatment program, and then at

8  the end of it, they can have those criminal charges sealed or

9  expunged.

10          And that's a very tall order.  There's no way that

11  the Government would set that up or the DOJ would oblige to

12  that if it wasn't for the fact that the correlation is

13  undeniable between PTSD from combat and criminal justice

14  involvement.  That's why signed into law last year was the

15  Veteran Treatment Court Coordination Act that gives money to

16  the DOJ to open up thousands of additional DTCs, including

17  federal-level DTCs.

18          And so last week I had sent a video to

19  Ms. Hackenberry, asking for her to consider allowing stateside

20  to pick up charges against me to place me into veterans' court,

21  because the Jacksonville DTC only allows for stateside stuff.

22          That's not because they shouldn't accept

23  federal-level stuff, there are federal-level DTCs in the United

24  States, but they're just more difficult to staff and funding

25  has been an issue in the past.

1    And so I ask that you consider some alternative, some
2    type of veterans' court alternative.  I don't know if I could
3    be transferred to a federal court that has a DTC.  I don't know
4    if I could help stand up a federal DTC here in Jacksonville.  I
5    don't know if stateside could pick up charges against me to put
6    me in DTC.

7    And I understand -- I recognize that me asking this
8    today is so unlikely.  I understand that it's not what you want
9    to hear.  I understand that I might be shooting myself in the
10   foot and I might get a worse punishment, because you might look
11   at me and say:  You know what, this guy doesn't get it.  This
12   guy is trying to minimize what he did.  He's trying to get some
13   favorable veterans' court.

14   And even in knowing all of that, I'm still up here
15   asking for it, because I believe in my heart that PTSD was the
16   main contributing factor as to why I ever was a different
17   person, why I made all those poor choices at that period in my
18   life.

19   No matter what happens, being in purgatory for the
20   last six years, like my attorney had mentioned, it doesn't look
21   like punishment from the outside -- and I didn't have to pay
22   back any money; I didn't have to sit in prison while we waited
23   for this.  I didn't even get arrested.  But thinking that we
24   were going to go to trial in six months, and then six more
25   months, and then 12 months, and 12 -- and then for the

1   six years always thinking that it was around the corner, it
2   kind of puts you in a mental prison.
3          So regardless of if I were put in veterans' court,
4   regardless of if I got 3 years in prison, 5 years in prison,
5   regardless, I've been affected very much, much more than I ever
6   thought I would have been from having this hanging over my head
7   for the last six years, and being able to move past those
8   severe PTSD issues, being able to move past and to really see
9   how much of a monster I was back then.
10          I'm honestly lucky that I didn't get in trouble with
11   the law for other stuff during that year or so period after I
12   got out of the military, because that was very much my
13   character.
14          And no matter what happens, I will go on to do great
15   things.  I will go on to contribute and to give back, to make
16   up for all the wrongs.  You know, maybe the saddest single
17   moment in my life was when I received the plea agreement and I
18   saw at the top of that the United States versus me.  And for
19   some reason that really broke my heart.  It's like I was -- I
20   was on your side, and then I really screwed it up.
21          And so regardless, I'll find a way -- I'll figure out
22   a way to make that up to this great nation.
23          Thank you, Your Honor.
24          THE COURT:  Thank you, sir.
25          Ms. Hackenberry, anything further from the United

1    States?

2              MS. HACKENBERRY:  No, Your Honor.  Thank you.

3              THE COURT:  Mr. Makofka?

4              MR. MAKOFKA:  Thank you, Your Honor.

5              Judge, as everybody that has spoken to the Court up

6    to this point has referenced, this case is, I guess, for lack

7    of a better word, somewhat long in the tooth through no fault

8    of any of the participants, but that's just the way it goes

9    sometimes.

10             And I say that because in the years that I've been

11   representing my client -- and I believe, again now, it's

12   about -- in or about 2016 when I began representing Mr. Funes,

13   I've gotten to know him fairly well.  You can't help but get to

14   know how someone is when you're talking to them frequently.

15   And we've had, my gosh, countless hours of consultation,

16   conversation, proffers.  You name it.  We've just had a lot of

17   interaction.

18             And the one thing really that I've taken away from

19   getting to know Mr. Funes as not just a client but on a

20   personal level is the change.  I'm struck by the remarkable

21   change in him that has occurred over the last several years.

22             I had furnished the Court with an updated letter from

23   his treating psychiatrist, Dr. -- he pronounces it Shay, but

24   the last name is spelled H-s-i-e-h.  He's a psychiatrist out of

25   Austin, Texas.  And I also furnished the Court and I'll be

1   referencing a letter from my client's eye doctor, Indukuri.

2          But with respect to Dr. Hsieh and with respect to

3   this defendant, when I met my client in 2016, he was very

4   clearly laboring under the influence of some problem.  He was

5   very scatterbrained.  He was hard to interact with.  And I

6   couldn't really nail it down.  I suspect that he was on drugs,

7   quite frankly.  And -- and I was correct.

8          In speaking with my client in recent conversations,

9   he's related to me that, yeah, when I was involved very early

10  on in this case, I was still using hard drugs.

11         And that explained it.  But he was also laboring

12  under the ill effects of profound mental illness.  And it's

13  interesting in hearing the prior presentation of the

14  co-defendant, Mr. Bezroukoff, hearing his remarks about his

15  PTSD, my client, too, was suffering from very serious mental

16  illness of a different variety.

17         My client, as the PSR in this case reflects, in his

18  early 20s developed very serious onset bipolar symptoms as well

19  as depression, and he suffered from those conditions for years.

20         Unfortunately for Mr. Funes, he never really --

21  although he sought mental health treatment, he never really had

22  a regimen of medications that straightened him out.  And

23  unfortunately for him, he was tormented by the effects of this

24  mental health status.  He began to use illegal drugs, as so

25  many people do, and he, you know, self-medicated is the

1    expression.

2          And there could have been, really, no worse

3    combination of factors to influence somebody than profound

4    mental illness combined with hard drugs.  It sent him into a

5    really poor state of mind.

6          And, of course, just as we heard in the last case, it

7    was in this context and it was in this time frame that

8    Mr. Funes connected with Scott Balotin and started engaging in

9    this conduct that has him here before the Court today.

10          My client certainly will be the first to tell you

11    that he knew what he was doing was wrong.  But in his mind, he

12    felt that it was somewhat justifiable because of the nature of

13    the offense.  He felt that he could send these folks in for

14    these prescriptions, and if it was signed off on by a doctor or

15    it was some other -- in some other fashion validated, and the

16    prescriptions were honoring these things, that it must have had

17    some bit of legitimacy to it all.

18          So he engaged in this conduct.  But for this mental

19    health condition, but for his unfortunate drug use, that

20    confluence of events, I don't believe he ever would have

21    engaged in this type of behavior strictly for the allure of

22    money.

23          It was fast cash, and it was a lot of it, and that

24    certainly could explain the temptation to engage in this kind

25    of behavior for any person.  But I feel if you look at his

1   history and characteristics, here's somebody that never dabbled

2   in this, never violated the law.  He was studying Bible studies

3   at a seminary-type university.  This is a person that was

4   flying the straight and narrow.  And then all of these things

5   happened sort of at once, and here we are today.

6           The good news, I feel, for Mr. Funes is that he was

7   eventually able, through his own doings, to find a physician, a

8   psychiatrist, Dr. Hsieh, that was able to straighten out his

9   medications and he's been doing beautifully since the 2017 time

10  frame.

11          He stopped using illegal drugs on his own, which is

12  remarkable.  He has not violated the law.  He's been on bond

13  for two -- roughly two years without one single hiccup.

14          I mean, here's the person that came from the depths

15  of a personal hell and was able to turn it around.  And I would

16  submit, in no small part, he has his doctor to thank for that.

17          I'd like to just read part of this letter from

18  Dr. Hsieh just on to the record, if I may.

19          Dr. Hsieh in his letter writes:  Upon reviewing his

20  history, Mr. Funes' history, prior to my care it appears that

21  Mr. Funes was either undermedicated or not medicated for many

22  years of his life.  His symptoms began in late teens with

23  occasional depressions and mild hypermanias throughout his

24  early 20s.  His symptoms appear to have accelerated sometime

25  around 2011 at the age of 27 after he abruptly left his wife of

1    six years overnight.

2            Since that time, he has experienced multiple periods

3    of depressed mood as well as hypermanic or manic episodes.  The

4    episodes appear to be of long duration, lasting weeks or

5    months.

6            David's self-medicating with drugs and alcohol also

7    began during this period and may have fueled some of his manic

8    behavior.  He did eventually receive a bipolar diagnosis after

9    self-admitting to a psychiatric hospital in Florida sometime

10   later in the year for lack of sleep and suicidal thoughts.

11           Although partially medicated, he continued to exhibit

12   erratic, impulsive behaviors, culminating in 2014 and '15, with

13   his time at CasePark.

14           And this is very significant.  David's criminal

15   behaviors, when seen in the context of his bipolar disorder,

16   are not surprising.  David has had significant issues with both

17   impulsivity and judgment since the onset of his bipolar

18   symptoms.

19           After moving to Austin, he continued to engage in

20   impulsive behaviors that included spending over $140,000 in a

21   two-month period, $80,000 on a failed nightclub, and $60,000

22   gift to a former boss.

23           And this is the last part I'm going to read.

24           I ask the Court to view his bipolar disorder as a

25   mitigating factor in regards to his sentencing.  He was still

1   exhibiting manic/hypermanic behaviors in 2014 which clearly
2   affected his judgment.  He did not fully begin his recovery
3   until 2017 when he was placed on the appropriate medication.
4   He's since become a model citizen.

5            I don't think I could say it any better than
6   Dr. Hsieh, and this is a person that's been treating him for
7   the last six years.  He has turned it around big time.  He's
8   extremely remorseful for his conduct that brought him here
9   today.  But I believe that that was, as I say, the result of
10  mental illness, profound mental illness, drug use, and the
11  allure of fast money.

12           But he's currently working.  He's got a very steady
13  job.  He makes about $80,000 a year.  He's doing beautifully.
14  And my concern is -- and I don't want to appear that I'm trying
15  to minimize his involvement in this case, but my concern is on
16  the guidelines, he's -- he's showing a term of incarceration,
17  even though it's a couple -- two-and-a-half years, let's say,
18  on the low end.  My fear is that he's incarcerated, and without
19  appropriate continued medical care, he backslides and bad
20  things begin to happen for him.  He certainly would lose his
21  employment at his current employer, and we're now moving in
22  regression instead of progression.

23           So I understand the Court has its job to do, and one
24  of the legitimate purposes of the sentencing statute is
25  punishment.  But as this prior defendant has indicated, I

1    believe it holds true for my client as well.  He has been in a

2    personal hell mentally for the last five years.

3              I've gotten numerous calls from him:  What's

4    happening?  Am I going to jail?  Am I going to prison?

5              This has been a purgatory.  Mr. Mairs said it best,

6    for both of these gentlemen, and, in particular, my client,

7    because he's not only worried, as anybody would be about what's

8    going to happen today, but he's been doing that with a troubled

9    mind and mental illness that he suffered with.

10             So whatever sentence the Court fashions, I would ask

11   Your Honor to take into account what I believe are seriously

12   mitigating factors, as I've put on the record here today.

13             I do know that Mr. Funes wishes to come forward at

14   this time, if it pleases the Court.

15             THE COURT:  Of course.

16             MR. MAKOFKA:  Thank you, Your Honor.

17             DEFENDANT FUNES:  Good morning, Your Honor.  I do

18   appreciate the opportunity to speak before you and the court

19   today.  And I do want to start out by saying I am deeply

20   remorseful for what I have done and I am taking full

21   responsibility for my actions.

22             You know, getting involved in this was very stupid of

23   me.  And the last six and a half years of my life I have been

24   in personal hell dealing with this every day, you know, there's

25   not a day that goes by that I don't think about this and

1    regret, you know, the stupidity of my actions.

2          So today, really, I kind of just want to tell you

3    about my life a little bit, kind of explain the reasons I got

4    involved in this -- in this crime, and then the changes I've

5    made in my life since then.  I think it's important to kind of

6    go over that with you as well.

7          So as my attorney alluded to, I've been struggling

8    with bipolar since I was about 20 years old.  I went to Bible

9    college.  I was raised in a good Christian family.  My mom and

10   brother are here.  But -- you know, so I went to Bible college.

11   But at that point, I was hit with my first major depressive

12   episode.  And, yeah, it was horrible.  For a few months, I

13   struggled with it.  And, really, I went from being a straight-A

14   student to almost failing my classes.  It was the hardest thing

15   I've ever gone through.

16         So I had a few of those episodes.  Early on, it was

17   more of hypermanic episodes that I was dealing with, until I

18   was about 26 or 27, when I was hit with my first major manic

19   episode.

20         I left my wife at the time almost out of the blue.  I

21   was being very impulsive with my purchases even back then.  I

22   bought a third car that we didn't need.  I tried to buy another

23   house.  I was blowing all my money, which is not normally how I

24   used to be.

25         So that was my first manic episode.  From there, I

became involved in drugs.  A lot of the reason I got involved
in drugs and alcohol was it did make me feel a little better.
I don't know if -- you know, not everyone's dealt with
depression and mania, but it's extremely difficult to deal
with.  And the alcohol made me feel a little better at the
time.  The drugs, you know, I thought it would help me, but I
didn't realize, later on, how much worse it would make my life.

So, yeah, I started partying every day at that point.
I was getting in trouble at work.  I almost lost my job.  And
it was around that point that I met Scott.  I met Scott out
partying at a club.  He took me out to dinner and kind of
explained, you know, how all this worked.

And really why I got involved, to be honest, was I
wasn't trying to purchase anything big, like a house or car, I
just wanted to be able to party more.  And in my mind, if I
could not have to work a 9:00-to-5:00 job, just be able to
party, do drugs, and drink.  That's why I really got involved.

I tried to -- I tried to make myself feel like I was
doing better than others by actually going to doctors' offices
and trying to do pharmaceutical sales.  But then I -- but
obviously where I made most of the money was getting the
kickbacks.

What I did is basically approached my friends, and
friends of friends, and I offered to pay them money to go to
the doctor.

1    I asked, you know:  Do you have a scar?  Do you have
2  migraines?  Things like that.
3    And if they did, I would offer them a kickback to go
4  to the doctor, which I know is illegal.
5    And, like I said, I am deeply remorseful for doing
6  that.  That was most of my involvement.
7    Where I really got hit on the loss -- on the loss
8  numbers is I think Scott at some point knew that -- you know, I
9  think things are going down, so he stepped down.  I had been
10  going out with Scott a lot.  We -- you know, we were partying
11  together.  I viewed him as a friend at the time.
12    He said -- he asked if I wanted to be a manager, I
13  guess, on this, which means you get a cut of every
14  prescription.  So at that point I started getting a very small
15  cut of every prescription, but that shot my loss amount through
16  the roof.  Even though I made way less money probably than a
17  lot of people, that crushed me, you know, when I became a
18  manager there.
19    So, again, that's on me.  That's a mistake on my part
20  for doing all that.  But -- so I guess that kind of explains
21  the extent of my involvement in that.
22    From there, things started spiraling even further out
23  of control.  I was still dealing at this time between manic and
24  depressive episodes.  I moved to Austin, Texas.  I wanted to
25  kind of explain the extent of my impulsivity.

1    Like my doctor said, I basically gave $60,000 to a

2 friend of mine without a contract at all.  He said he was going

3 to pay me back, and I believed him.  I got a couple payments,

4 but I never got that money back.

5    I tried to buy a nightclub.  Originally I think I put

6 down $40,000 on it, then I bought the other partner out.  I was

7 partying a lot in my own club, doing drugs and things like

8 that, and the club went under.  Just -- I couldn't effectively

9 manage or do anything.

10    At that point in my life, Your Honor, all I cared

11 about was partying and doing drugs.

12    So it was around that time, I think you saw that I --

13 I have one other arrest on my record, I believe it was in 2016,

14 it was for a PI and criminal mischief charge.  To be very

15 honest, Your Honor, I don't remember doing it because I was so

16 messed up on substances, I probably did.

17    All I remember is waking up in jail and not knowing

18 why I was there.  And I know it was the drugs and alcohol.  I

19 was incoherent at the time.  So I was scared to death the next

20 day when I went before, like, the judge that's in the prison.

21 And I was like:  I don't know what I did.  It could be

22 horrible.  You know, I had no idea what I had done at that

23 time.

24    But I did -- had that dropped off my record basically

25 because I worked with them, with the court at that time.

1    So, really, all this culminate -- all this

2   destructive behavior culminated in me losing everything.  So I

3   lost over $300,000, or whatever it was I made from this scheme.

4   I also had over $100,000 in my 401K, which I blew.  So I went

5   from living this lavish lifestyle to basically becoming

6   homeless.

7    My mom can tell you about that.  I lived out of a

8   hotel for over a month.  I had a girlfriend at the time that

9   she had a job where each day she got paid, and if we had enough

10  money, we could stay at the hotel; if not, we couldn't.  And I

11  had to -- because few times we had to stay out of our car.  I

12  called my parents a couple times to give me money to stay at a

13  hotel because I had no money.

14    All -- all my credit cards were overcharged.  My bank

15  account was overdrawn.  I'm sure if you look back, you could

16  see all of this.

17    But this is the -- really the hardest part of my

18  life.  I finally hit rock bottom during that time due to losing

19  everything.  I remember that I was in such a bad mental state

20  that I -- I got kicked out of my apartment.  I left all my

21  furniture there.  I didn't even think to put it in storage.  My

22  mind wasn't thinking properly back then.

23    I was partying with bad people who had stolen a bunch

24  of my stuff.  My car was stolen from me and I barely got that

25  back before apparently someone was going to chop it up for

1    parts.  Just what I dealt with was the hardest thing I ever had

2    to deal with.  We were in hotels for over a month.  After that

3    I distinctly remember that we were finally able to get an

4    apartment.  I think we had $200 to our name that day, so we

5    went to Target.  All we could afford was an air mattress,

6    blankets, and a couple other items for the house.  And we had

7    no furniture for a couple months.  We had nothing.

8            So I went from this scheme where I made all this

9    money to losing everything and completely hitting rock bottom,

10   all the while going through intense -- at this point, I was

11   intensely depressed.  I was going through the mania a lot of

12   the other time with the club and all that.  And then when I'm

13   manic, Your Honor, I make the dumbest decisions.

14           And I'm glad that I hit rock bottom because I didn't

15   completely stop doing drugs in 2016 when this happened, but I

16   couldn't afford to do much more, so that started to help.

17           But really where the story gets better -- it's not

18   all doom and gloom.  Because in -- at the end of 2017, I did

19   meet my psychiatrist -- to take a step back.  I've probably

20   been on 15 different medications up to this time.  And the

21   reason why -- bipolar is a very hard thing to deal with,

22   especially for me.  I had very bad side effects on almost

23   everything I took.  So almost everything else I was on made me

24   extremely sick, so I never was properly medicated before that.

25           But Dr. Hsieh finally was able to put me on the right

1  medications and there was a huge change in my life after about

2  a month or two.

3          One thing I didn't say that's really important,

4  though, to go back, is I don't know if you were given the 30

5  pages of medical records from Wekiva Springs here in

6  Jacksonville when I was -- when I was committed to the mental

7  health facility.

8          Were you given that at all by Josh Blakely?

9          THE COURT:  I don't think I have the --

10          DEFENDANT FUNES:  I can submit that.

11          THE COURT:  It's summarized in the presentence

12  report, but I don't have the actual medical records.

13          DEFENDANT FUNES:  If it will make a difference to

14  you, I'll give it to you.  Because I think it's a very good

15  description of -- I was in a mental hospital for three days.

16  This was in 2012, which is two years before I got involved in

17  this, so I think that can substantiate the extent of my bipolar

18  problems.

19          That was my other worst depression.  I almost killed

20  myself.  I had suicidal ideations, and I finally checked myself

21  into a mental hospital and I was there for three days.  That

22  was actually when I was first diagnosed as bipolar was in 2012.

23  I was suffering from it since I was 20 years old.  But they

24  finally realized that I had mania, not just depression, back in

25  2012.  So I will hand that to you at the end.

1    But going on -- I want to try to make the rest of
2    this brief.  So I've seen a remarkable change in my life since
3    the end of 2017.  So it's been about four years.  When I was
4    put on the right medications, I no longer wanted to do drugs.

5    It was like a switch was flipped in my mind.  And so
6    I, you know, I've been clean.  I've been doing what's right.
7    And I think I've tried my best to become a model citizen.  I
8    ruined a lot of relationships before this.  But after 2017, I
9    was able to reconcile with my mom and brother and the rest of
10   my family.

11   I have a great relationship with them now.  And I
12   really think I've learned from my mistakes.  I've gotten back
13   in church.  I go to Red Rocks Church in Austin.  I was going to
14   Gateway before that a couple years ago.  But I'm involved in
15   church.  I tried to get involved in a rescue mission here but
16   they said with this case, I couldn't do it.

17   So it's been hard for me.  I'm trying to clean up my
18   life in every way I can but this has just been hanging over me.

19   I think in ending this, my biggest fear in all of
20   this is if I do time that I won't get the proper medical
21   treatment that I need, including taking the medications that
22   have made such a big difference in my life.  And I don't want
23   to have a relapse.

24   The last four years of my life have been the only
25   years of my adult life where I felt normal as a person.  And,

1   like I said, I want to change.  I actually -- my mission in

2   life now -- I wrote it out.  My church encouraged me to do it.

3   But my mission is to use my life story to shed light on mental

4   illness and encourage others who suffer from mental illness to

5   get the help they need to live the life of their dreams.

6           So although I did all these bad things, I'm going to

7   use this for good and try to help other people with mental

8   illness and other people that have been involved in things like

9   that.

10          So, Your Honor, I appreciate the time that I get

11  before you on this.  I just ask that you take into account what

12  I've told you as well as my willingness to cooperate and take

13  responsibility from the beginning.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.

16          DEFENDANT FUNES:  And I will give you the -- I think

17  this is important to give you also.

18          MR. MAKOFKA:  The Wekiva Springs record, Your Honor.

19          DEFENDANT FUNES:  From 2012, two years before the

20  crime.

21          THE COURT:  Okay.  Thank you.

22          MR. MAKOFKA:  That concludes your remarks?

23          DEFENDANT FUNES:  Yes.

24          MR. MAKOFKA:  Your Honor, my client had two

25  witnesses, and I believe they'll be brief, if it pleases the

```
 1    Court.
 2              THE COURT:  Certainly.
 3              MR. MAKOFKA:  We'd call Jeanine Tarango forward.
 4    This is my client's mother.
 5              You have some remarks you wanted to address to Judge
 6    Howard.
 7              THE COURT:  Before you start, ma'am, can I ask you to
 8    spell your first and last name for my court reporter.
 9              MS. TARANGO:  Jeanine, it's J-e-a-n-i-n-e; Tarango is
10    T-a-r-a-n-g-o.
11              THE COURT:  All right.  Go ahead, ma'am.
12              MS. TARANGO:  Thank you so much for allowing me to
13    speak for my son.  I'll try to focus.  But David Funes, he was
14    raised in a Christian home.  And from a small boy, we taught
15    him right from wrong, and growing up he was just an amazing
16    little guy.
17              He was so smart and he would learn Bible verses like
18    crazy.  He knew -- I had a chart and he had all these Bible
19    verses memorized.  And he wanted to become a missionary.  So it
20    was just like a dream that you have a child that wants to do
21    this kind of thing with his life.
22              Well, he grew up and he continued making good
23    decisions.  He went to college by age 17, and he was getting
24    straight A's.  He got straight A's all through school.
25              He was just very, very bright.  And he met a really
```

sweet girl in college and he married her.  He was active in his
church.  He was a youth pastor.  And he had an excellent job
and he was moving up the ladder, was able to buy a house.  And
he was only in his early 20s.  So, I mean, as parents, you're
so proud of your child.

        Well, after several years, something happened and
everything changed and he started making crazy decisions.  His
life just started spiraling out of control very quickly, and he
was doing really crazy and irrational things and we could not
understand it.

        He lost his wife, as he told you.  He lost his job,
his home, and we had no idea what was going on.

        We tried so hard to try to reach out and help him,
but he just -- there was nothing we could do.

        Years later, he was diagnosed with bipolar disorder,
and so that started making a little sense.  We didn't know
anything about bipolar, so we had no idea.  But definitely you
can look back and see the things that happened to him and how
that affected him.

        At some point in this time, he started abusing
alcohol and drugs, and that obviously did not help the
situation.  He became very different towards us.  We were
always a very close family.  We have seven in our family, and
we were always very close.  And I would always say that, you
know, one thing I can say, and thank God for it, is that we are

a very close family.  But when David started all this, we all
just -- he pushed away from us and we all just didn't know how
to deal with him.

We tried to help him, but he didn't want our help.
He just wanted to continue down this road, and so I finally had
to just let go and just pray.  And David just continued to make
lots of bad decisions, including the one that brought us here
today, and it broke our hearts.

But this went on for a few years.  And then David,
one day, came to us.  It was Thanksgiving a few years ago, and
we had our meal, and most of the family went home, but David
said:  May I talk to you, Mom and Dad?

And so we all sat down, and he started telling us
about how he had lost his job, his apartment.  How all of his
belongings had been stolen by so-called friends.  How he -- he
was just -- he was a whole different person.  We were so used
to arrogant prideful David that was always bragging about what
he had and not being coherent because he was on drugs.  I even
asked him once:  Are you on drugs?  And he said no.  But he
was.

And, anyway, this night, he was humbled.  He was
broken.  And he was embarrassed because he had to face his mom
and dad and tell them, you know, I need your help.  I got
myself into trouble.  And then he told us about this whole
case, and that really broke our hearts, but we loved him and we

1  said we're going to be here for you, David.  We know that
2  you're trying to do right.
3          And he definitely did.  He's trying to do right.  He
4  has a very good job.  He's back in church.  I remember him
5  sending me a verse on the text.  And I was so excited, a Bible
6  verse.  I said:  David, now we can talk about Bible verses
7  together.  You know, we couldn't do that for so long.
8          He's closer to his family.  We're all very close
9  again.  He has such a desire to do right and help other people
10  now.  And we actually enjoy being with him, which for a while
11  there we didn't, because all he would do is just brag and talk
12  about things we didn't want to talk about.
13          The sad thing about all this, David made all these
14  changes but there are consequences because of his bad decisions
15  during that time, and there were consequences then, there are
16  consequences now, and there are consequences in the future.
17          So all -- I just want to end this by saying to you
18  that I have been praying for your wisdom to know what to do,
19  and I understand that you will make -- I believe in my heart
20  that you will make the decision that is right for my son.  My
21  heart's desire for him is to be close with -- continue to get
22  close with God and to help other people.  Because as I always
23  tell him, whatever we go through, we can reach out and help
24  other people because we understand it.
25          So I just thank you so much for letting me speak.

1      THE COURT:  Thank you, ma'am.

2      MR. MAKOFKA:  Judge, we only have one other witness,

3  if we may.  I'd like to call Stephen Funes, the defendant's

4  brother.

5      MR. STEPHEN FUNES:  Spell my name?

6      THE COURT:  Yes, please.

7      MR. STEPHEN FUNES:  It's Stephen, S-t-e-p-h-e-n; last

8  name the same, Funes, F-u-n-e-s.

9      THE COURT:  Go ahead, sir.

10      MR. STEPHEN FUNES:  So I work at a church and a

11  school, and I'm always told I'm long-winded so I wrote mine out

12  so it wouldn't take too long.

13      But I also -- first I want to talk about bipolar.  I

14  also have bipolar, unfortunately.  I have Bipolar II.  I have

15  opposed to David's Bipolar I, which basically means we have the

16  same lows, but my highs is called hypermania; his highs are way

17  more extreme called mania.  My highs make me feel basically

18  what I consider most people probably normal; whereas his highs,

19  as you can tell, lead him to do crazy and impulsive things.

20      For about three years, I didn't know I had bipolar.

21  I thought maybe it was I wasn't sleeping enough or maybe I was

22  needing more exercise or maybe I needed to get closer to God

23  and let him fix it, or maybe it could be something else.  The

24  fact that there was actually a chemical imbalance in my brain

25  never really crossed my mind.  Because when you've lived 26

1  years of your life as normal, like I had, having a mental
2  disorder pop up is not something that I would expect or that I
3  wanted to accept either.  And I can tell you, living with
4  bipolar with no medication is really terrible.

5          I was experiencing super low lows, with no energy, no
6  motivation, no memory, no desire to be near people and actually
7  no will to live as well.

8          The highs actually made me feel really good.  I was
9  actually productive.  I could catch up on all the things I fell
10  behind on during my lows.  And I felt energy and motivation.  I
11  felt like I had purpose during those times.  Those are the only
12  times I felt like I was normal.

13          The crazy thing is I had no control whatsoever of
14  when I would switch from a high to a low.  For me it was like
15  every two weeks.  I know my brother is a lot more long-term.
16  And if I would have been able to find something that could help
17  me switch, I'm sure I would taken advantage of that.

18          I started not being able to remember things, not
19  being able to do very simple things that I had done many, many
20  times before.  And I remember being so scared that I didn't
21  want someone to find out, my boss.  I was working at a mechanic
22  shop.  I didn't want him to know that I had this problem.  So I
23  tried to hide it as best as I could, even though it was getting
24  worse.  It was crippling me.

25          During my highs I liked being around people.  During

my lows, I hated being around people.  And one of the memories
I have is just sitting in the bathroom stall at church for
quite a few times, just because I didn't want to talk to
people.  Just staying in there, trying to get away from people.

At one point I also even -- it got so bad that I took
myself to a psychiatric hospital.  The year -- I don't remember
when that was.  But it was scary when it was happening and I
had no idea what it was.

So after that point in time is when I was diagnosed
with Bipolar II, and I realized what it was and that medication
actually was helping me.

So I had no more ups and downs.  I was much more
fulfilling in life, steady and predictable life.  And now I've
been a school administrator at Kelly Baptist Academy in New
Brownsville, Texas, for the last six and a half years, which I
could never have done before.

I've also been able to tutor students in the
difficult maths and sciences.  Which, again, I could never have
done before.  I couldn't remember anything back then.

So as you can see, the medication completely allowed
me to do a lot more than I was able to before, and I thank God
for that, for sure.

Secondly, after bipolar, I'd also like to talk about
my relationship with David.  We were always very close.  I
moved in with him of all my siblings when I got out of college

1   to help me get up and on my feet.  We have a lot of similar
2   interests, love traveling, loved playing sports together.  We
3   had a good brother relationship.
4           But during the time all this period of stuff was
5   happening, our relationship was basically -- it didn't even
6   exist.  He was living a lifestyle I didn't agree with.  I'd
7   pray for him and ask God to change him and get ahold of his
8   life.  And we'd hardly ever talk on the phone.  When we did, it
9   would be really short, because he'd start telling me about all
10  the bad things he was doing and I told him I didn't really want
11  to hear about it.
12          When he would come to family gatherings, like
13  Thanksgiving and Christmas, it was all about him, how much his
14  clothes cost, how much his car costs, and what he was doing,
15  which, again, we didn't want to hear about.  So it was really
16  hard not having that relationship like we had before.
17          But when he finally was able to find the medication,
18  started getting in the right frame of mind and going to church
19  again, our relationship has come back.
20          So it's been a few years since then, since he
21  obviously changed for the better.  And it really is like I have
22  my brother back and I'm very thankful for that.
23          He now has a purpose in life, and it's not all about
24  him anymore.  He's doing his best to try to follow God.  And he
25  loves being around our family and having good, clean fun, which

1   is a lot better.

2           So regardless of his mental state, I know my brother

3   did the things that he did and he's responsible for what he

4   did.  At the same time, however, when one's mental state is

5   altered, depending on the situation, there's many times there's

6   almost nothing you can do to be normal, to act normal, or to

7   have a normal life.  It's incredibly rough.  And I know because

8   I also experienced it for myself.

9           I'm very thankful that God and my family stuck with

10  me through it all and now I'm out on the other side.  Just like

11  I've been striving to do, I know my brother is also striving to

12  do what's right, and he'll continue to strive to do what's

13  right to make his wrongs right by giving back to people, by

14  influencing people's lives, and by helping them avoid making

15  costly mistakes.

16          So David's experienced many incredible highs, but

17  also many terrible lows, and he's learned a lot of

18  life-changing lessons through all of it.

19          In addition, as it's been mentioned several times to

20  the Court, my brother's been waiting for six years to be here

21  before you today.  I know having this -- his life basically on

22  pause, it has been a really hard struggle for him.  I'm

23  thankful that that part will be coming to an end today.

24          I hope and pray that you'll see what I'm saying, what

25  we've been saying, and that you'll let my brother David have

1  another shot at the thing called life.  And I know he's not

2  going to disappoint you, not going to disappoint the country.

3  I know he's going to do great things.  He has awesome

4  motivation now.  He's going to be a huge and positive role

5  model.  I've actually thought of having him come to speak at

6  our school when all this is done because he can have a lot of

7  things to share.  But he's going to be a great testimony to his

8  peers and also to this next generation.  Thank you for your

9  time and letting me speak.

10             THE COURT:  Thank you, sir.

11             MR. MAKOFKA:  That concludes our presentation, Your

12  Honor.  Thank you.

13             THE COURT:  So I'm going to mark the article that

14  Mr. Bezroukoff handed up as Mr. Bezroukoff's Exhibit 1 to put

15  in the record.

16         (Bezroukoff Exhibit 1 was marked for identification.)

17             THE COURT:  I have a letter here from Dr. Indukuri.

18             MR. MAKOFKA:  Yes, Your Honor.

19             THE COURT:  That is not in the record anywhere.  The

20  other letter is attached to the PSR, but Dr. Indukuri's is not.

21             DEFENDANT BEZROUKOFF:  Can I say one thing on that,

22  Your Honor?

23             THE COURT:  Yes.

24             DEFENDANT BEZROUKOFF:  I just wanted to tell you what

25  that's for.  I've had -- I had a detached retina earlier this

year.  I've had three surgeries on it now.  Right now I can't
see at all out of my right eye.  I have an oil bubble in it
that they have to -- I have an appointment December 9th to get
it out.  After that, my eye is supposed to recover.  But that's
what that letter is explaining is I need a recovery period, and
my eye can eventually have complications if they don't take
this oil bubble out that I can't see through right now.

THE COURT:  So I'm going to ask Madam Deputy to
redact the date -- Mr. Funes' date of birth, and then the
Retina Group of Texas, Dr. Indukuri's letter will be
Mr. Funes' -- well, actually, instead of redacting it, what I'm
going to do is have -- Madam Deputy, have you file under seal
the letter from Dr. Indukuri as Mr. Funes' Exhibit 1, and the
documents from Wekiva under seal as Mr. Funes' Exhibit 2.

(Funes Exhibits 1 and 2 were marked for identification.)

THE COURT:  I'm torn as to how to proceed at this
point.

You-all have -- have all expressed the desire to have
some closure on this.  Mr. Bezroukoff has expressed it all the
way back to when he was testifying, and Mr. Funes and his
family have alluded to the need to have this resolved, but I --
I need some time to consider what an appropriate sentence is,
particularly after hearing additional information that was
presented here today.

What I'm trying to decide is whether that is just

1  putting it off for a week or so, or whether it would be better

2  to move it to January to let the surgery be completed and --

3  and I -- I considered putting these sentencings off myself,

4  because, as Ms. Hackenberry, Mr. Mairs, and Mr. Makofka know,

5  generally when I'm sentencing individuals that have engaged in

6  similar conduct, I like to have them together.  I like to have

7  a better idea of -- and I didn't have that by doing these two

8  so early, which made me think that I should put these off.

9        I didn't because I knew -- I recalled Mr. Bezroukoff

10  testifying about how this had been hanging over him for

11  five years is what I remembered.  And so I thought I would go

12  forward, but more and more I'm feeling like it would be better

13  for me to have that additional information before proceeding.

14        I guess I'll -- I'll hear from you-all as to your

15  thoughts on those matters.

16        And, Ms. Hackenberry, I'll throw you under the bus

17  and get your thoughts first.

18        MS. HACKENBERRY:  Your Honor, whatever the Court

19  wishes.  I don't have any objection to that effect what the

20  Court needs to do in order to fashion an appropriate sentence,

21  and I have no objection to postponing it.

22        THE COURT:  Mr. Mairs?

23        MR. MAIRS:  Your Honor, on behalf of Mr. Bezroukoff,

24  we also don't have any objection if the Court feels it's

25  appropriate to delay imposition.  We understand and we

1    appreciate that you were able to provide the information today,

2    and we'll defer to the Court.

3              THE COURT:  Mr. Makofka?

4              MR. MAKOFKA:  Thank you, Your Honor.

5              Similarly as to Mr. Funes, we've had a chance to

6    discuss it briefly, and we too would concur that if the Court

7    is of the mindset that continuing this matter for deliberations

8    would be appropriate, we would have no objection to that, Your

9    Honor.

10             THE COURT:  I probably should have gone with my gut

11   instinct to begin with, and I'm kind of regretting that I

12   didn't do it.  But I -- first of all, I need to -- I have to

13   have time to read the information that Mr. Funes gave me.  I'd

14   like to read the entirety of the article that Mr. Bezroukoff

15   gave me.  But it is -- it is very apparent to me, much more so

16   than it was before I came into the courtroom today, that the

17   mental health challenges that these two individuals have faced

18   played a much more significant role in the offense conduct than

19   I understood.

20             And in looking at the importance of avoiding

21   unwarranted sentencing disparities, I would feel more

22   comfortable, as I said, if I knew -- there are a lot of people

23   involved in this that I'm going to be sentencing, and I do not

24   want -- well, one of the reasons I started sentencing people

25   involved in the same conduct together, or at least after I had

1  seen all the PSRs, was because I've been in the position where
2  at the end I have regretted some of the sentences that I
3  imposed sooner because I didn't have enough information, and I
4  wouldn't want to make that mistake again.
5         So I'm going to -- I'm going to take this under
6  advisement.  I'm going to request that the court reporter
7  provide me with a full transcript, and obviously I have my
8  notes.
9         And if I have any question about -- later, whether I
10 have the full import of what was presented, I have the ability
11 to, through my court reporter's equipment, to actually listen
12 again to everything that was said.  But I'm not going to impose
13 sentence today.  I don't have -- I don't have all the
14 information today to do the right thing.  So I'm going to
15 continue the sentencing.
16        I feel bad doing that because I know that that means
17 you have Thanksgiving and Christmas and you won't know what
18 your future holds.  And I apologize to you for that.  But
19 please trust and believe me when I tell you it is the right
20 thing for us to do.
21        MR. MAKOFKA:  Thank you, Your Honor.
22        THE COURT:  Just so we know where we are,
23 everybody -- all of the presentations have been completed,
24 unless, Ms. Hackenberry, there was something you wanted to say
25 at the end there.  I don't know that I asked.

1          MS. HACKENBERRY:  No, Your Honor.

2          THE COURT:  And is there any bar to sentencing from

3     the perspective of the United States?

4          MS. HACKENBERRY:  No, Your Honor.

5          THE COURT:  Mr. Makofka?

6          MR. MAKOFKA:  No, Your Honor.  Thank you.

7          THE COURT:  Mr. Mairs?

8          MR. MAIRS:  No, Your Honor.

9          THE COURT:  So that's just a technicality that means

10    all of the arguments have been completed.  When we reconvene, I

11    will simply be addressing the sentence.

12          I need to look at the calendar and see where the

13    other folks are, so I think I'm just going to say that it will

14    be reset by further notice, and I'll get with Ms. Wiles.

15          It likely -- the two individuals that were convicted

16    at trial still haven't even filed their post-trial motions.

17    I'm not going to hold off for those two, because that would --

18    that would push us probably into the summer.

19          But the other folks, I think I can look at where they

20    are, and I think it's just -- Mr. Stevens is going to be way

21    off, and Mr. Balotin and Mr. Lawrence's client will be way off.

22    We won't wait for those.  But I will probably figure out when

23    the critical mass of the other defendants, or at least when I

24    will have seen their presentence reports and set this -- the

25    completion of this closer to that time frame.

1    All right.  Anything else that we need to do at this

2    time?

3         MR. MAKOFKA:  No, Your Honor.  Thank you.

4         THE COURT:  And Mr. Funes' family, if we want -- if

5    you want to either be present or hear the hearing when we do

6    come back, I'll -- so that you don't have to travel back here,

7    I'll either find a way to let you appear by Zoom or at least

8    let you appear by phone so that you can -- because it's my

9    fault that we're not proceeding today.

10        MR. MAKOFKA:  Thank you, Your Honor.

11        THE COURT:  All right.  Happy Thanksgiving.

12        MR. MAKOFKA:  Happy Thanksgiving, Your Honor.

13        THE COURT:  We're in recess.

14        COURT SECURITY OFFICER:  All rise.

15      (Proceedings concluded at 11:13 a.m.)

16                          -   -   -

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

    I hereby certify that the foregoing transcript is a true
and correct computer-aided transcription of my stenotype notes
taken at the time and place indicated herein.



        Dated this 9th day of June 2022.




                /s/Cindy Packevicz Jarriel
                Cindy Packevicz Jarriel, RPR, FCRR